Good morning, Robert Peterson, Corday Collins, Oz-Surf Int'l LLC, and Derek Wilson. Hopefully, we've adequately briefed the issues and supplied you with a sufficient record. Therefore, subject to any questions, I'd like to reserve my time. I'd like to just ask a question again. Are you challenging the website component of the injunction or just the product sales component? Just the product sales. Just the product sales, all right? Thank you. And you're not challenging the possibility that your opponent has a breach of contract claim against you for selling in violation of the agreement. But what you're challenging is that it's not a trademark violation. Correct. I have no further questions. Why wouldn't the breach of contract support the injunction as well? Well, first of all, the ruling on the injunction I don't believe was based upon the breach of contract theory. But there would be an adequate remedy at law for damages. For breach of contract. Well, that's a good argument to the district court. But district court chose to impose an injunction based on a breach of contract. It could do that, right? Well, then I would go back to the record. We didn't brief this issue, but there is sufficient evidence in the record. Well, I take that back. They do have a breach of contract claim. That wasn't the claim that the district court based its ruling on. The district court, as I understand it, and the breach of contract claim would be for failure to pay. And since we have claims back against them, the district court would have had to balance the equities to determine whether there was an adequate basis for an injunction for a mere breach of contract. Okay. Thank you. We'll hear from the other side. May it please the Court and counsel, my name is Lawrence Campitello, and I represent the respondents in this matter, Optima Corporation Limited and Great Ways Proprietary Limited. As far as the district court's granting of the preliminary injunction, there was considerable substantial evidence to support the granting of the injunction. Not only were the goods not paid for and Mr. Wilson trying to sell those goods and pocket the proceeds for himself without paying for the goods, but there was evidence. Did your claim that the title to these goods had not passed because the consideration for them had not been paid? That goes to the question of first sale. In other words, are you claiming that there was no first sale? Well, with regard to the first sale issue, the appellants argued to the trial court that there was a sale, a legitimate sale, between Wilson Corporation and OzSurf. No, no. I'm talking about the other one. I'm talking about your client's sale to Wilson. Is there any claim that title didn't pass because Wilson didn't pay and, therefore, there was no first sale?  No, there was $120,000 worth of goods shipped. There was $60,000 worth of payment. Is the record such that we can determine that the $60,000 which was not paid prohibits under the terms of the agreement title to have passed? I don't know that the record supports that. I didn't think so. But I will say that there was, again, substantial balancing of the equities here in that these goods, not only were they not paid for, but they were being diverted by Mr. Wilson from a liquidation proceeding that was pending in Australia. The goods sold to Wilson Corporation, quote, unquote, sold to Wilson Corporation were removed from Wilson Corporation, diverted to OzSurf, and, therefore, taking those goods out of the liquidation proceeding to the detriment of Wilson Corporation's creditors, the largest one of which was my client. All right. I'd like to follow up on Judge Bea's question, just to clarify. Is there anything in the record that shows that you argued that the sale was invalid to Wilson? No, I don't think there is. But the, again, with the balancing of the equities that the Court engaged in, at the time that Wilson and OzSurf were trying to sell these goods, we had a subsequent distributor in place, Optima Corporation. Optima Corporation had negotiated an exclusive right to sell those goods in the United States. Mr. Wilson, by continuing to sell the goods in breach of the contract, was violating Optima's rights under its agreement, and also there was evidence. I thought your theory is that you withdrew the license because of nonpayment. That is correct. And once they withdrew the license, they could own the goods, but they couldn't sell them because the license was gone. I thought that was the theory. That is one theory, and also the theory being that what Wilson Corporation or OzSurf or Mr. Wilson was doing was effectively engaging in a bait-and-switch tactic. He was using these goods, using my client's name, marketing these goods in an effort to draw customers to his business so that he could sell his own knockoff brand of products. He had his own brand of surfboard bags, deck grips, surf leashes, exact same products that he had bought from my client. And the fact that there's a claim, which we disagree with, that Mr. Wilson went out of business as a result of this injunction, I think highlights the infringement upon my client's name. The court's injunction did not prohibit Mr. Wilson from selling his own goods, only prohibited him from selling goods, our goods. And the fact that he went out of business, quote-unquote, as a result of not being able to use our client's name, I think highlights the fact that this was his modus operandi, was to just use our name to draw customers to his business, in violation of the agreement that had been terminated. Also, I wanted to address the other issues raised by the appellant. The first sale doctrine that the court mentioned, again, there was no legitimate sale between Wilson Corporation and OzSurf. The court properly found, trial court properly found. But there was a legitimate transaction between your client and Wilson. That was a sale, wasn't it? A sale that was for which he didn't pay. That's correct. But there were ---- And for which you could sue him for breach of contract. That's true. Well, we could ---- Wilson Corporation was in liquidation proceeding, and that was the basis of it, was his nonpayment of goods. But the first sale rule only protects against trademark infringement. And in this case, there were, as I mentioned already, a number of equitable grounds for the court to enjoin OzSurf from selling these goods to third parties, regardless of, you know, not based on trademark infringement. For example, the failure to pay, the diverting of the goods from Australia, the fact that he was baiting and switching and violating Optima's rights to sell these goods. There was a lot of other equitable bases that could support and do support the trial court's ruling in this case. I thought your theory was that once he ---- once they revoked the license, that defeated his right, the first sale rights, because he had an express license. Normally, the way first sale works is you sell something, cause a conflict to a consumer. There's an implicit license to the consumer, and on the first sale doctrine, they can then go ahead and resell it or make a gift of it or put it on eBay or whatever. So that's what the ---- there's an implicit license. But when you have an express license that's revoked, I thought the first sale doctrine doesn't apply at all. Well, we agree with that. I mean, there's been ---- That's the ---- so what the injunction is based on is the fact there's no license. They can keep the goods, maybe. They have a breach of contract claim for the value of the goods, but they have no license to resell it. That's correct. And that was another argument that was made to the trial court on which the trial court did base its ruling, among other things. It sounds to me like the winning argument. I'm sorry? It sounds to me like the winning argument, not just the ---- We hope so. I mean, all the other stuff is pretty much mush. Well, again, you're going to hear from the appellant that Mr. Wilson, and I'm using that name collectively, was not a licensee in the traditional sense, that he wasn't manufacturing goods using my client's and attaching my client's name to them. He was simply a distributor who was buying goods and reselling them. No, we can take it up with him. It seems to me the distributor has to have a license. We agree. Mark, if somebody is a distributor of Coca-Cola, they have to have a license from Atlanta from Coca-Cola. If you're a Coca-Cola bottler, you bottle the goods locally, but you have to have a license from Atlanta to sell the stuff under the Coca-Cola label. Absolutely. I believe we did. That's sort of an analogy. We did cite the court to authority that a party can be both a distributor and a licensee, and, in fact, if you look at the distribution— You have to be a licensee to be a distributor. Exactly. How else do you sell the goods? And the agreement in this case is consistent with that. Mr. Wilson was granted the exclusive right to sell these goods and market these goods and advertise them. And that license was revoked? It was revoked. I don't think there's any dispute about that. Okay. Thank you. Thank you. Is my time up? No. Thank you. Please sit down. Okay. Thank you. I'd just like to address the last point. Isn't it very wonderful? Thank you. The last point.  My client was a distributor. He maybe was a licensee in the sense that he had the right, pursuant to the distribution agreement, to use the name of Oz Surfer Creatures and Leisure, which was the brand name of the goods. But he was not a manufacturing license. A distributor, in essence, is—and since he was an exclusive— He was an exclusive. I understand. He wants to sell these goods. He has to have a trademark license to sell them, just like if you sell Coca-Cola. You know, you can sell the stuff, the syrup, but if you want to put the Coca-Cola label on it, you better have a license from Coca-Cola. And he didn't put a label on anything. He ordered—the analogy would be is he ordered from Coca-Cola and said, Coca-Cola in Atlanta, ship me 1,000 cases. They come, and he puts them in his warehouse, and he sells them. That's all he did. He didn't—he didn't label anything. But he has to have a license to sell and trade my goods. No, he doesn't. I mean, if you sell them to Nordstrom's— He did have a license, right? No. He had a just—no. He didn't have a license. Well, if you have—if— If it wasn't constitutional, he did have a license. Let's look at the contract, then. The contract does not use the term license. Well, what does it say? Let's look at it. Do you have it? Do you have it? Distribution agreement? What does it say? It does not use that term. Well, I understand. What does it say? It says that he is the exclusive distributor in the United States. In other words, he's just like a Ford dealer. You buy the cars from Ford, and you put them in your warehouse, and you sell them. Now, or you could be—you could buy—you could be Ralph Soup— He was also a Ford dealer once. Once Ford reboxed a license. I agree with that. However, he does have the right to say and to advertise and say, I have this particular brand of product, and I want to sell it.  Where does he get— I don't understand this issue. I'm sorry. You said he has the right, but I'm saying where does he get the right? How does he get the right? To advertise using the trademark. Well, where does it start? It's a common law right. If I'm— No, it's not. No, it's not. Okay, well— Why don't you persuade me? Okay. If I'm Nordstrom's department store, and I buy a Talbot tie. Right. I can put a label on a counter and say, Talbot ties. I can advertise in the newspaper and say, I am selling Talbot ties. You know, you're just saying the same thing all over again. I don't think you can. I don't know where you would get that tie if Talbot says you're no longer a distributor. Because at that point, you're not selling it as a distributor. You're selling things that you've acquired under the for sale doctrine. I don't understand this. A distributor— On terms of advertising, in 9.1, it says, the distributor will use its best efforts to promote the products in the territory and to develop and maintain the goodwill and reputation. Yes. So it seems to me you do have the right to advertise. Of course. But I believe that you have that right. But then it gets revoked. When that gets revoked, you lose the right. No, because if you have acquired the goods, if you've acquired goods in a free market, you have a right to sell those goods. First of all— You keep jumping between sell and advertise. But let's talk about that. We're talking about advertising for now. Where do you get the right to use the trademark in advertising? Certainly the for sale doctrine doesn't give you that right. The for sale doctrine just says, if you buy something, you can go ahead and sell it to somebody else, if you buy one product as a consumer. That's a normal application of the for sale doctrine. Where do you get the right to advertise it? He has that—I'll call that a common law right. And your authority for that is? We didn't brief that issue, Your Honor. Well, then he goes. Well, I hope that— You know, you are relying on something you can't give me authority for, and you tell me you haven't briefed it. Well, let me address it this way, then. That was not the basis of the injunction, or the injunction was not that you couldn't advertise. It was, in our cases, based upon—they said you can't sell. You can't sell the goods. It was based on the absence of a trademark license. The injunction clearly—I mean, it may not have been based on breach of contract. That's something that might require a remand, but it was clearly based on the absence of a trademark license. Okay. Even if there's no license, if I've acquired goods, if I've purchased goods and there's no issue of title and I own those goods, I have the right to sell those goods. This is not an evidence-based— As long as you don't hold yourself out as a licensee authorized by the manufacturer to sell as his licensee. Absolutely. And that issue was not part of the injunction. That issue was raised and— Do you see any difference between Bill Blass' case and yours? Yes. What's the difference? The primary difference is that in the cases where they have prohibited someone from selling goods that are trademarked, it is based on a license, and the licensee was the person or the company who manufactured the goods. If there is a contract that says you can manufacture goods— And then sell them as our licensee. That's Bill Blass. Yes. In your case, you get the finished goods in your warehouse, and you have the right because you now own the goods to sell them to— Yes. And I don't care if I'm—there's no difference between being an exclusive distributor and just a regular retailer. You've bought goods. You get title. You have a right to sell them. Yes. No, it's clear. There's no difference between being a distributor and being a retailer, but I don't see where a retailer— If Nordstrom loses his license to Talbot Ties, I don't see where they can advertise we are selling Talbot Ties. Where does that come from? Because Nordstrom doesn't have a license from Talbot Ties. All it does is buy— Every retailer doesn't have a license from the manufacturer to sell the goods. They just buy them and they sell them. It's that simple. This is an issue. I wasn't prepared for this issue because it's one of those issues that's never discussed because it doesn't come up because it's not an issue. If I buy from Coca-Cola or I buy from Talbot Ties and I run a store, I can sell those goods once I've bought them. I own them. The first sale doctrine is, and if I have those, the issue would be, from the retailer's point of view, if by advertising those for sale, that constitutes trademark infringement. And obviously, if you've sold the goods to someone, that person has the right to tell the marketplace, I have these goods. Otherwise, you could never tell anybody what brand you have. And whether you tell them— Well, no. That's why there's a license that goes with a good. But when the license has been revoked, I don't see how you can— There isn't a license. There isn't a—normally, there would be an implied license. No, there doesn't even have to be a license. Or you could make the argument there's an implied license. But if I own a store, whether it's any retail establishment or wholesale establishment, and I get brand goods, I can sell them. I mean, if you say that there has to be a license and a license is revoked, well, first of all, there wasn't a license. If you read the agreement, there wasn't a license. I think we understand. Thank you. Thank you. The case's argument stands submitted. We'll next hear argument N, United States v. Bowman. Thank you.
judges: Kozinski, Nelson, Bea